# In the United States Court of Federal Claims

No. 23-1657C

(Filed Under Seal:  March 20, 2024)

(Filed: March 29, 2024)

|  |  |
|---|---|
| **RAYTHEON COMPANY,** | ) |
| | ) |
| *Plaintiff,* | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| **and** | ) |
| | ) |
| **BAE SYSTEMS INFORMATION AND ELECTRONIC SYSTEMS INTEGRATION INC.,** | ) |
| | ) |
| *Defendant-Intervenor.* | ) |

*Kevin P. Connelly*, Vedder Price P.C., Washington, D.C., for Plaintiff.  With him on the briefs were *Jeffrey M. Lowry* and *Kelly E. Buroker*.

*Steven M. Mager*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, *Douglas K. Mickle*, Assistant Director.  Also on the briefs were *Theresa M. Francis* and *Cristina Costa De Almeida*, Department of the Navy.

*Scott M. McCaleb*, Wiley Rein LLP, Washington, D.C., for Defendant-Intervenor.  With him on the briefs were *Jon W. Burd*, *Sarah B. Hansen*, and *W. Benjamin Phillips, III*.

## <u>OPINION AND ORDER</u>[1]

*SOLOMSON*, **Judge.**

In procurement protest cases pursuant to 28 U.S.C. § 1491(b), the standard of review always matters.  In this case, it is decisive.

Defendant, the United States — acting by and through the Department of the Navy — eliminated Plaintiff, Raytheon Company, from a procurement for the development of countermeasures against radar-guided missiles for the F/A-18 fighter jet.  The Navy defends its disqualification of Raytheon based on a determination that Raytheon's employment of a retired Navy technical expert gave rise to the appearance of impropriety.  The Navy maintains it has the discretion to remove Raytheon from the competition pursuant to the Federal Acquisition Regulation ("FAR"), as interpreted and applied by our appellate court, the United States Court of Appeals for the Federal Circuit, in *NKF Engineering, Inc., v. United States*, 805 F.2d 372 (Fed. Cir. 1986).  Raytheon challenges its elimination from the procurement.

There are two ways for Raytheon to prevail in this case: (1) show that the Navy's material factual findings undergirding its decision are not supported by the administrative record; or (2) demonstrate that the Navy's decision to eliminate Raytheon does not meet the *NKF* standard.  As to the first issue, the Court finds that the Navy's contracting officer ("CO") conducted a comprehensive investigation and made reasonable fact findings based on that investigation.  As to the second issue, Raytheon's view is that, pursuant to *NKF*, the government must show some concrete impact on the procurement for there to be even an appearance of impropriety.  The Court rejects this strained and narrow reading of *NKF* and instead follows this Court's long-standing interpretation of *NKF*, which is that the government may eliminate an offeror from a procurement based on the mere appearance of impropriety.  The government is not required to find that an alleged impropriety had an actual (or even likely) impact on the procurement, or even that the outcome of the procurement suggests that it was tainted or unfair.  *See* 805 F.2d at 376.  In sum, the CO performed a thorough and reasonable analysis of the record facts in concluding that an appearance of impropriety justified the government's exclusion of Raytheon from the procurement at issue.

---

[1] On March 20, 2024, the Court filed this opinion and order under seal and provided the parties the opportunity to propose redactions.  ECF No. 67.  On March 28, 2024, the parties filed joint proposed redactions, ECF No. 69, which this Court adopts in full, and accordingly reissues this public version of this opinion and order.  Redacted text has been replaced with [ * * * ].  Although aspects of the challenged procurement are classified — along with part of the administrative record and briefs filed in this case — this opinion and order was prepared without reference to any classified materials.

The Court is sympathetic to the notion that eliminating an offeror for the mere appearance of impropriety may seem questionable as a matter of policy, because, even when based on hard facts, such an assessment is highly subjective. Indeed, whether a series of facts "has a certain aroma that is hard to purify," *NKF*, 805 F.2d at 377, is in the eye of the beholder or, to extend the Federal Circuit's metaphor, the nose.[2] But given that the FAR — as interpreted in *NKF* and as consistently applied by this Court — provides the government with such broad power, and given the deferential standard of review that governs cases like this one, this Court has little choice. Raytheon cannot win this case unless the Navy's fact findings lack support in the record or its conclusion based on those facts is arbitrary, capricious, or otherwise contrary to law. On the legal issue, Raytheon can find no help at the trial court level; the Navy applied the correct legal standard set by the Federal Circuit in *NKF*. And though the Court is somewhat sympathetic to Raytheon's view and characterization of the facts — *i.e.*, even conceding that Raytheon's view of the facts is itself reasonable — the CO's analysis is also reasonable. The Court's charge, however, is not to determine which party's narrative or characterization is superior; rather, the question is only whether the government's determinations and findings are supported by the record and are reasonable. Where, as here, the government's fact-finding is reasonably supported by the record and its analysis of those facts is likewise reasonable, the Court is constrained to hold that the government is entitled to judgment. With that said, there are some very troubling facts that Raytheon fails to overcome.

## I.    FACTS AND PROCEDURAL HISTORY[3]

Except where indicated, the facts detailed in this section are undisputed and are drawn directly from the administrative record. To be sure, Raytheon disputes the legal *implications* of these facts, but hardly any of the facts themselves.

### A.    The Dual Band Decoy Program

Dual Band Decoy ("DBD") systems are meant to address the problem of radar-guided missiles targeting military aircraft. Current combat aircraft, specifically the F/A-

---

[2] *I.e.*, Justice Potter Stewart's "I know it when I see it" formulation. *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

[3] This background section constitutes the Court's findings of fact drawn from the administrative record. Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005). Citations to the administrative record, ECF No. 43, are denoted as "AR" followed by the page number **bolded** in the lower right-hand corner of each page of the administrative record.

18 Super Hornet, use towed-decoy systems that attract radar-guided missiles away from the aircraft. *See* AR 169. To upgrade its countermeasure capabilities, the Navy sought, first, to contract for a "Demonstration of Existing Technologies [("DET")] . . . to increase the Government's knowledge and understanding regarding existing technologies that can be applied toward the development of an expanded/wideband RF towed self-protection decoy to counter current and emerging RF threats worldwide." AR 290. In the next phase of the DBD program, the Navy sought to contract for the Engineering, Manufacturing, and Development ("EMD") of improved DBD technology. AR 296. The Broad Agency Announcement ("BAA") for the DET contract made clear that it was not the Navy's endgame; rather, "[t]he Navy's intent [was] to develop and implement an expanded next generation towed radio frequency (RF) self-protection decoy capability as soon as feasibly possible." *Id.; see also* AR 169 (Navy Acquisition Strategy Document noting that its "objective" is "to execute the technology development (TD), engineering, manufacturing and development (EMD) and full rate production (FRP) stages of the DBD program"); AR 282 (Navy's Acquisition Plan calling the DET contracts "the first contract action for DBD").

In layman's terms, the DBD effort comprised research and development, with the DET contract focused on research, and the EMD contract drawing on that research for development of new technologies. *See, e.g.,* AR 160.14, 160.46 (Raytheon response to DBD Request for Information ("RFI"), [ * * * ]; AR 719 (BAE DET proposal putting "DET program in context of a possible acquisition roadmap leading to . . . an EMD program"); AR 3398-99 (Navy evaluator scrutinizing BAE proposal for "EMD solution??" and suggesting that it could be a "Pro?" that BAE has possible solutions "that address [some] shortfalls and could be implemented in EMD."). That there would be an "EMD phase" of the DBD program to follow the DET contract was no secret; materials from all three parties to this litigation reference EMD well before its official inception as a Request for Proposals ("RFP"). *See, e.g.,* AR 3400, 3417, 3425-26, 3429. Raytheon and BAE both won contracts for the DET procurement phase. AR 290. This case concerns Raytheon's exclusion from the second stage of DBD, which is the EMD contract.

**B. VK**

This case primarily concerns the activities of one Navy employee, [ * * * ] ("VK"),[4] his subsequent employment at Raytheon, and his involvement with the DBD program for both employers. VK served as a mathematician for the Navy for many years beginning in 1989, but his work that is relevant for this case began in 2014, when he

---

[4] Some documents in the administrative record and some of the parties' briefs refer to [ * * * ] by his initials, "VK." *See, e.g.,* AR 48026 (Contracting Officer's Determination and Findings); ECF No. 49-2 at 1. With these exceptions, the Court does the same to avoid the need for any additional redactions. Quotations referring to VK by name or other alias have been altered to fit this style without brackets or other notations.

became "Chief Technologist for the Defensive Electronic Warfare Division . . . and the Multi-Spectral Electronic Warfare System Support Activity (MDEWSSA) Integrated Product Team" of the Naval Air System Command ("NAVAIR"). AR 48028. In that role, VK was an electronic warfare ("EW") technology advisor for NAVAIR, with particular expertise in countermeasure systems. *See* AR 48082, 51145-47, 50923, 28679. He was also a NAVAIR resource for EW knowledge generally. *See* AR 48084. VK was broadly regarded as a "subject matter expert (SME) . . . on multiple U.S. Navy programs over his years of Government service due to his knowledge and experience concerning [radio frequency] countermeasures in the areas of threat identification, techniques for detecting those threats, and testing of countermeasures." AR 48028.

### C. VK's Work on the DBD Program as a Navy Employee

VK's "first encounter with dual band decoy technology" was prior to 2014, as part of a "routine" collaboration between the Naval Research Laboratory and NAVAIR "to keep NAVAIR informed as to the development of various emerging technologies." AR 48084-85. His subsequent work indicates that he was well-versed in DBD matters. Though VK "was not officially a member of NAVAIR's DBD DET team," AR 48029, VK's coworkers recognized him as a SME, and consulted him on a variety of EW programs. *See* AR 48029, 48084, 48088, 48090. He "participated in the preparation of an effects-based EW model for the F/A-18E/F in order to test the effectiveness of the landscape of conceptual and/or emerging EW countermeasures that aircraft could potentially utilize against an emerging threat." AR 48028. More specifically, VK's work entailed "(i) analyz[ing] the threat environment, and (ii) work[ing] with experts in a range of engineering disciplines in order to write probability models based on engineering principles, which theoretically evaluated potential effects of future technologies" including DBD, "and simulat[ing] how they would perform in the threat environment, once further developed." AR 48028-29. In the 2017-2018 timeframe, VK coordinated the government "engineering team's review of a draft of what would eventually become the DBD DET GOALS Document," whose purpose "was to inform bidders as to the Navy's performance objectives *for a future DBD*." AR 48085 (emphasis added).

VK had access to proprietary and source-selection information regarding the DBD program. For instance, VK confirmed in writing to colleagues as early as October 2018 that he had access to a restricted-access network sharedrive with a secured folder full of sensitive source-selection information regarding the "DBD BAA," with no distinction made between the DET and EMD phases. AR 48141. Due to the procurement-sensitive nature of the information he could access, VK had to sign a non-disclosure agreement ("NDA") for the DBD program. AR 48268-72. On October 4, 2018, VK sent that signed NDA, which identified potential offerors including Raytheon, AR 48272, to the DBD Source Selection Evaluation Board ("SSEB") Chairperson, AR 48141, the individual "responsible for the overall management of the SSEB and acts as the SSEB's interface to the Source Selection Authority." AR 48030. Just like the BAA and VK's confirmation of

access to the sharedrive, the NDA he executed was not limited to a particular phase of the DBD program. Rather, the NDA indicated the "Solicitation Number/Name" as simply "Dual Band Decoy." AR 48269. At the risk of undue repetition, the NDA clearly treated the DBD program as a single procurement.

The NDA further provided as follows:

> [5a.] I will not solicit or accept, directly or indirectly, any promise of future employment or business opportunity from, or engage, directly or indirectly, in any discussion of future employment or business opportunity with, any officer, employee, representative, agent, or consultant of any of the firms which have expressed an interest in this acquisition or submitted proposals.

> b. I understand that my obligations under this certification are of a continuing nature. If at any time during the source selection process, I encounter circumstances where my participation might result in a real, apparent, or potential conflict of interest, I will immediately seek the advice of an Ethics Counselor and report the circumstances to the Source Selection Authority.

AR 48270.

BAE Systems ("BAE") and Raytheon both received DBD DET contract awards in May-June 2019. Meanwhile, VK continued to provide technical support to the DBD program. *See* AR 48089-90; AR 48093.

### D. VK's Departure from the Navy and his Move to Raytheon

In November 2019, while working for the Navy, and contrary to the NDA's prohibitions, VK initiated contact with a senior director at Raytheon who worked on the company's DBD contract, expressing interest in employment opportunities. AR 49088. The next month, VK met with Raytheon's EW Business Unit's Systems Engineering Director, who "conveyed that [Raytheon] was seeking a Senior Manager Systems Engineering and Test Director to support integration, verification, and testing of Raytheon's dual band decoy technologies in performance of the DET contract." AR 48083. VK applied for that position on December 14, 2019. *Id.* VK did not immediately disclose to the Navy that he had sought employment with Raytheon. AR 48092. Indeed, the record does not support that VK disclosed his ongoing negotiations with Raytheon *at any point*. In his own statements made during the CO's investigation, VK does not mention any such disclosures prior to January 6, 2020, when

he told his supervisor that he "planned to retire from federal civil service to work at Raytheon."  AR 48083.  VK does not claim to have told anyone about the conversations he already had with Raytheon's representative.  *Id.*  Moreover, VK's supervisor only "vaguely recall[s]" that "in early January 2020," VK made "a passing comment to the effect that he planned on leaving the Government and that I should no longer send him any work assignments concerning Raytheon."  AR 48092.  VK continued to work on the DBD program during this time period, as detailed below.

VK received a formal employment offer from Raytheon on January 13, 2020, AR 48288, and accepted it on January 15, 2020.  AR 48292.  On January 16, 2020, VK applied to retire from NAWCWD, indicating that he was "retiring for personal reasons" and "*seeking* employment outside of Federal civil service."  AR 48083 (emphasis added).  Of course, by then, he already had accepted Raytheon's job offer and was not "seeking employment."

On February 19, 2020, VK submitted a request for post-government employment advice to NAWCWD's Office of General Counsel ("OGC"), AR 49130-35, describing his position with NAWCWD as a "systems engineer in the Self-Protection [EW] division" where his "primary duties include research, development, test and evaluation of self-protection jamming systems."  AR 49131.  VK neither disclosed to the OGC ethics counselor any involvement in the DBD program nor did VK mention DBD in any way.  Describing his future duties for Raytheon, VK reported that he "will be serving as a systems and test engineer for countermeasures systems not related to the systems I currently support."  AR 49132.

On March 2, 2020, the OGC ethics counselor issued VK a post-government employment opinion letter.  *See* AR 48075-81.  Though the letter cautioned VK against "representing anyone else before the government in connection with particular matters in which he had personal and substantial participation or . . . pending under his official responsibility," AR 48079, the letter did not mention DBD.  The omission of any reference to DBD makes sense, however, as VK had not reported any involvement in the DBD program to OGC.

VK continued to work for NAWCWD, and to communicate with other government personnel about DBD, until March 27, 2020.  AR 49769.  He maintained access to NAWCWD's Microsoft SharePoint site,[5] which included files from both BAE Systems and Raytheon in support of DBD DET performance, such as bi-weekly meeting

___

[5] https://en.wikipedia.org/wiki/SharePoint ("SharePoint is a web-based collaborative platform that integrates natively with Microsoft 365. Launched in 2001, SharePoint is primarily sold as a document management and storage system, although it is also used for sharing information through an intranet, implementing internal applications, and for implementing business processes." (internal footnote omitted)).

briefs and Contract Data Requirements List deliverables.  AR 49780.[6]  This is the one significant fact that Raytheon disputes.  The CO found that VK had uninterrupted access to the DBD SharePoint site, based on: (1) a declaration by the Navy's DBD DET project lead, AR 48031 (referencing AR 49780); and (2) the absence of any "evidence that VK requested his access to . . . [the] SharePoint site containing files regarding BAE's DBD DET performance be revoked," or that access was, in fact, revoked.  AR 48048.  Raytheon disputes this version of events, based on VK's later contention that his "access to the sharedrive was eliminated" when the Navy decided "to conduct the evaluation of DBD DET proposal[s] solely at Patuxent River."  AR 49609.

Given that this is a "trial on the record," *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005), and is subject to the APA standard of review, the Court determines that the government's fact-finding is reasonable and accepts its version of events.  There is no dispute VK had access to the DBD sharedrive containing BAE and other procurement sensitive documents.  There is similarly no dispute that the record contains no evidence such access was ever revoked.  ECF No. 66 ("Tr.") at 19:2-8 (Counsel for Raytheon admitting that "[t]here is no proof" in the record "that affirmatively demonstrates an IT professional revoked VK's access to the share drive"); Tr. 20:10-11 (Counsel for Raytheon admitting that "[t]here is nothing in the record that clearly demonstrates [VK's] access was revoked").  The CO also reasonably relied on a declaration from the individual who requested that VK be provided with access to the sharedrive.  AR 48060-61.  That declaration supports that VK and his coworker had further discussions about "DBD requirements, evaluations, and performance."  AR 48088.  These discussions would have required VK to be up to date on DET evaluations based on information accessible through the sharedrive.  *See* Tr. 31:9-32:20.  Furthermore, VK's story changed over time.  First, on December 16, 2022, he claimed that, to the extent he could recall, he "was not granted access to this server" and thus "had no access to any responses from any bidder associated with the Navy's DBD DET procurement."  AR 48086.  Then, on May 11, 2023, without ever admitting his earlier error, VK suddenly recovered a concrete memory that his access had been revoked.  AR 49609.  The CO did not find that credible and found no indication he ever lost access.  AR 48048, 48060.

The Court finds that the CO's conclusion is reasonable, at a minimum, based on the record evidence.  The CO's conclusion is especially reasonable when considered together with other indications that VK was not entirely above board — *e.g.*, failing to tell

---

[6] VK had access to proprietary information through two "shared" points of access, a shared, networked hard drive folder ("sharedrive") and the SharePoint site.  Though there were multiple means of access, the appearance of impropriety regarding VK's access stems from his ability to see the underlying information, and the CO found that VK's access to that information, through the sharedrive or SharePoint site, was never revoked.  *See* AR 48048, 48060.

anyone at the Navy about his negotiations with Raytheon while continuing to support DBD and violating the NDA.[7]

On April 3, 2020, prior to VK's beginning employment with Raytheon, BAE sent Raytheon a letter of concern regarding VK's extensive work with BAE as a Navy employee, "on a number of programs including. . . Dual Band Decoy." AR 48293. BAE expressed concern about VK's "in depth insight into BAE Systems' technical solutions and intellectual property," and reminded Raytheon to abide by post-government employment requirements. AR 48293, 49980.[8]

On April 20, 2020, VK began his employment with Raytheon as Senior Manager Systems Engineering and DBD Test Director, AR 49982, "responsible for running the team of engineers responsible for testing Raytheon's prototype decoy to generate the data required by the Navy under the DBD DET contract." AR 49972.

Raytheon assigned VK the task of "develop[ing] test procedures to demonstrate that Raytheon's DBD DET system fulfilled Government performance goals set out in the DBD DET contract" — the precise contract on which VK worked at the Navy. AR 49982. His portfolio of responsibilities further included the DBD DET "Program Test and Verification Strategy and all associated work products for DBD DET" that would be presented to the Navy, *id.*, and representing Raytheon at meetings with the Navy about DBD issues, *see* AR 48090. In his new role as senior manager at Raytheon, VK was "[r]esponsible for all aspects of product and system level requirements tracing, test planning, integration and test execution including laboratory test, environmental test, and flight tests for electronic warfare systems." AR 49982. "After considering multiple possible uses for VK's skills and experience," Raytheon assigned him "to develop test procedures to demonstrate that Raytheon's DBD DET system fulfilled government performance goals set out in the DBD DET RFP." *Id.* In that capacity, VK "was

---

[7] Raytheon argued that access to the sharedrive was limited to SSEB or similar officials, which did not include VK. Pl. MJAR at 6 ("only source selection team members were permitted to access DET source selection information"). Raytheon could not substantiate that claim at oral argument, and eventually backed away from it. Tr. 17:17-19:11. Raytheon also agrees that a CO's finding of an appearance of impropriety may be based on the actions of government officials that are *not* members of the evaluation team. Tr. 97:12-16; *see also* Tr. 99:22-100:11 (Raytheon counsel agreeing that there is nevertheless at least some record evidence, *see* AR 48145, indicating that VK was part of the "DBD/DET team").

[8] BAE did not notify the government of its concerns because BAE had no specific reason at the time to believe that Raytheon might deploy VK in an improper manner. AR 48293 ("While [VK] is likely subject to restrictions after his Government employment, BAE Systems is providing this notice to Raytheon to inform you that [VK] has this knowledge."). Raytheon did not respond to BAE until May 14, 2020, finally assuring BAE "in a direct discussion" that Raytheon had taken certain "steps . . . to address BAE Systems's concerns." AR 49463-64; *see also* AR 48297.

responsible for the execution of the Program Test and Verification Strategy and all associated work products for DBD DET." *Id.*

At 7:30 AM on April 21, 2020, his second day on the job, VK emailed a member of Raytheon's human resources team, with the subject line "DBD." AR 48152. In the email, VK asserted that "the extent of [his] participation on this program . . . was very limited and occurred early in the program before the RFP [was] released." *Id.*[9] He elaborated that "the total exten[t] of [his] direct participation" was as "one of several engineers creating [a] list" of "test assets . . . that would be applicable to the program. *Id.* VK noted, however, that "[t]his list was included in the RFP documents." *Id.* This obviously raised some concern about VK's responses to Raytheon's ethics questionnaire; VK's explanation was that the "questionnaire asked for direct contract involvement which there was none, therefore I omitted this participation." *Id.* VK, however, recognized the issue the government later raised itself: "to make sure there is no *appearance of a conflict of interest* for us as I do not believe there is." *Id.* (emphasis added). The email appears to have ascended the chain of authority within Raytheon's legal department, AR 48151, 49771, but the email chain is largely redacted due to attorney-client privilege, Tr. 63:19-21.

In December 2020, the Navy issued its RFI for the EMD contract, the next phase of the DBD program after DET. AR 12232. VK contributed to Raytheon's response to the RFI by testing the performance of Raytheon's prototype DBD — which itself resulted from the DET contract — and providing comments regarding its responsiveness to the Navy's requirements. AR 49972-73. According to VK's supervisor at Raytheon — the lead systems engineer for Raytheon's DBD program — VK made two substantive "contributions to [Raytheon's RFI] response beyond generally providing testing data and analysis that impacted the EMD draft RFP specifications." AR 49973. "First, VK noted [ * * * ]" and, "[s]econd, VK provided [ * * * ]" *Id.* "Using that [ * * * ] *Id.*

In April 2021, the Navy issued a draft RFP for the EMD contract. AR 12298. On May 3, 2021, VK informed Raytheon that his last day as a Raytheon employee would be May 14, 2021. AR 49093. Before he resigned, however, VK appeared on Raytheon's behalf at a May 12, 2021, DBD EMD presolicitation conference. AR 49973-74.[10] VK resigned from Raytheon, effective May 14, 2021. *Id.; see also* AR 48082, 50780.

NAVAIR released the DBD EMD RFP in June 2021, and received two proposals, one from Raytheon and one from BAE Systems, by the proposal receipt deadline. AR 51390.

---

[9] Notably, notwithstanding that Raytheon maintains that the DET and EMD procurements are completely distinct, VK himself made no effort to distinguish between the different DBD stages.

[10] Materials from this conference, especially the Navy's "DBD Acquisition Approach" slide, further indicate that DBD was considered one procurement with multiple phases. AR 14562.

### E.  CO's Investigation

More than a year later, in August 2022, a Navy "technical evaluator" raised a question about the circumstances of VK's retirement from NAWCWD and employment with Raytheon.[11]  AR 51390.  That same month, NAVAIR's CO for the DBD program began investigating "whether VK's involvement with the DBD program created an actual or apparent conflict of interest that compromised the integrity of the pending DBD EMD award."  AR 48027.  On September 6, 2022, the CO sent a letter to Raytheon about a "Potential Conflict of Interest; Dual Band Decoy Solicitation Number N00019-21-R-0050." AR 48692.  The CO informed Raytheon that the agency had just learned of a potential conflict of interest issue involving VK and requested "relevant information . . . regarding the circumstances of [VK's] hiring and his work at Raytheon."  *Id.*

On September 12, 2022, Raytheon responded to the CO, asserting that VK "did not participate in any way with the development of Raytheon's DBD EMD proposal." AR 48296. Raytheon asserted its understanding that due to VK's "very minor involvement with the NAVAIR *DBD program* while still employed by the government," there was no "need to bar him from working on the program while at Raytheon." AR 48295 (emphasis added).  The Court notes that Raytheon's assertion suggests that it also viewed the DBD as a single program.  *Id.*  Raytheon did *not* disclose VK's involvement in preparing Raytheon's response to the EMD RFI.

On October 21, 2022, the CO asked Raytheon some "'follow-up questions' regarding VK's hiring and his "contributions to the DBD EMD."  AR 49084.  Raytheon's response provided some additional facts and background regarding VK's hiring, and acknowledged that VK "was one of several Raytheon engineers supporting Raytheon's DBD team[,] . . . was on distribution for DBD related email messages directed to Raytheon's engineers including those that dealt with its DBD EMD RFI response[,]" but maintained that VK "provided no specific recommendations regarding Raytheon's DBD EMD RFI response."  AR 49087.[12]  Raytheon maintained that VK had "provided no input for the subsequent Raytheon DBD EMD proposal."  *Id.*

---

[11] "During the course of informal discussions with an SSEB legal advisor, a[n] . . . SSEB technical evaluator questioned how a former and long-time Government employee supporting PMA-272, VK, was able to leave the Government and work for Raytheon Technologies, Inc., which is a competitor in the current DBD EMD procurement.  The SSEB attorney immediately informed the Contracting Officer of this potential conflict."  AR 48026-27.  PMA-272 refers to Advanced Tactical Aircraft Protection Systems group, which includes the DBD program.  *See* AR 14553.

[12] The phrase "no specific recommendations" is a creative way to qualify VK's work on the RFI response.  There is no question that VK provided guidance or input or direction; those descriptive nouns might fall short of "specific recommendations," but VK advised Raytheon regarding the RFI, and the company's response to the CO obfuscates that fact.

On November 28, 2022, the CO informed Raytheon of "a potential significant conflict of interest" regarding Raytheon's employing VK on DBD matters, which put Raytheon at risk of "being excluded from further consideration in this [DBD EMD] competition." AR 49094. Raytheon had the opportunity to provide the agency with "any…information" Raytheon had to demonstrate that it had taken steps to "avoid, neutralize, or mitigate this potential conflict of interest to support a decision not to exclude Raytheon from the competition." *Id.*

On December 16, 2022, Raytheon responded to the CO, AR 49096-111, and continued to insist that Raytheon had "exercised extreme care when hiring VK and examining potential conflicts," and that the CO's proffered facts were largely "inaccurate and/or neither necessitate nor justify exclusion of Raytheon under the law." AR 49096. Regarding VK's DBD involvement while with the Navy, which Raytheon had previously described as "very minor," AR 48295, the characterization shifted to "fairly limited and long-since ended" with "no specific involvement with the EMD phase." AR 49099-100. However, Raytheon did admit that VK "assisted in revising or developing support plans for the Navy, which outlined the infrastructure required to facilitate testing of a DBD DET solution at NAWCWD." AR 49101. Nevertheless, Raytheon maintained that "neither VK nor Raytheon are aware of any work he performed while employed by NAWCWD that could be considered personal or substantial with respect to DBD EMD," describing VK's DBD EMD activities as "limited" and "not significant." AR 49102.

In conducting his investigation, the CO reviewed classified and unclassified emails, attachments, calendar entries, and other documents relating to VK's involvement in the DBD program while VK was a government employee and after he left government service. AR 48027. The CO reports that in conducting his investigation he received "relevant information from DBD EMD SSEB team members [including] emails, calendar notices, or other supporting documentation" and "obtained relevant information from other Government personnel who worked with VK in support of the DBD DET source selection and post-award performance." *Id.* The CO further interviewed and obtained declarations from VK and at least 11 individuals who worked closely with VK at the Navy for insights into the nature of his work there. AR 48027, 48073-74. The CO also had DBD EMD SSEB members review Raytheon's EMD proposal "to determine whether the proposal contained evidence of any non-public, competitively useful agency information, or BAE proprietary information." AR 48027. The CO also reported that he "[o]btained additional information from Raytheon regarding its hiring of [VK], his involvement in Raytheon's DBD-related efforts," and "from BAE on what non-public, proprietary, and competitively useful company information [VK] may have had access to or possessed." *Id.* Finally, the CO examined "emails and meeting notices that were collected by Naval Information Warfare Systems Command," and "information related to the post-Government employment ethics opinions issued to VK from the agency." *Id.*

**F.  CO's Determination and Findings**

On April 14, 2023, the CO issued his Determination and Findings ("D&F").  *See* AR 48022-72.  The D&F contains a detailed description of the CO's investigative steps, a comprehensive recitation of the fact findings, and a detailed analysis of them.  The CO's primary conclusion upon which the government now defends Raytheon's exclusion from the procurement was that VK's "actions created, at minimum, the appearance of a conflict of interest."  AR 48072; *see also* Tr. 12:9-12; 12:24-13:7.  Though the CO pointed out several apparent contradictions and other information suggesting that VK's behavior was not, in fact, fully above board, those findings did not form the primary basis of his ultimate conclusion.  *See, e.g.*, AR 48033-34 (finding evidence that VK had not recused himself from DBD matters after accepting Raytheon's contingent offer).  Rather, the CO focused instead on a few significant facts in determining that VK's actions — including his employment and role at Raytheon — created at least an appearance of impropriety, justifying Raytheon's exclusion from the EMD procurement.  *See* AR 48064, 48065, 48066, 48069-70.

In particular, the CO determined, as a preliminary matter, that the DBD DET and DBD EMD are "interrelated" insofar as they are "two phases of one continuous development effort from an acquisition standpoint."  AR 48045.  Thus, any involvement VK had with the DET contract was regarded as involvement with the "integrally related" EMD contract — both are part of the overall DBD program and procurement.  AR 48053.  Addressing the potential rejoinder that the DET and EMD efforts might not be "considered one continuous development effort from an acquisition standpoint," AR 48046, the CO found that pursuant to the FAR, "[a]cquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract."  AR 48046 (quoting FAR 2.101).  Pursuant to that definition, the CO reasonably determined that "[VK]'s DBD participation included not only the DET contracts, but the EMD procurement as well."  *Id.*

The first significant factor leading the CO to recommend disqualifying Raytheon for an appearance of impropriety was a series of facts suggesting that VK was "personally and substantially" involved in the DBD program starting in 2018.  AR 48046.  VK was one of "six total people...identified to define the new decoy techniques given certain parameters."  *Id.*  He contributed "technical discussion[s]," "defined requirements for what would become the DBD DET Goals Document," was consulted as an expert on DBD "demonstration and measurement parameters and verification methods," and had access to "the restricted, secure DBD DET BAA sharedrive to support . . . [the] Importance to Mission Evaluator, in the evaluation of the Offerors."  *Id.*  The CO found that throughout the DBD process, VK "helped define techniques for a towed decoy . . . provided inputs

on the DBD DET Statement of Objectives as well as the scope of testing to be conducted in support thereof . . . [and] directly participated in Government discussions on requirements for what would become the DBD DET Goals Document." AR 48068. "Further, he was privy to internal Government exchanges about its DBD requirement, what it valued, and what it did not." *Id.*

With all this evidence taken together, the CO found that "it is likely that VK's early involvement in establishing the Government's DBD requirement provided him with unique insight regarding the Government's future DBD requirements." AR 48068.

The CO further considered the specific time period between November 15, 2019, and January 15, 2020, during which VK sought employment with Raytheon while still a Navy employee. "While he was personally and substantially participating in the DBD DET contracts," in November 2019, VK "began seeking employment with Raytheon when he sent an email to . . . an employee of Raytheon . . . expressing his interest in employment opportunities." AR 48047. The process that followed indicated to the CO that VK "was a person of divided loyalties" as "Raytheon's financial interests were imputed to VK such that the financial interests of Raytheon would serve to disqualify VK to the same extent as if they were VK's own interests." *Id.* Specifically, the CO found that VK made substantive recommendations to the DBD project lead regarding the DBD DET effort, such as providing "recommendations [that] introduced test points for surface-to-air radar threats to the already identified test points for air-to-air missile threats." AR 48050. VK's "participation impacted the performance data demonstrated during DBD DET by creating additional data points" which affected the EMD effort as they "would be provided to substantiate the DBD EMD solution for the DBD EMD procurement." *Id.*

Having "failed to recuse himself from the DBD DET contracts and DBD EMD procurement while he sought employment with Raytheon," VK was "financially conflicted." AR 48047. The CO found that VK "did not provide written notice to his supervisor of his job-seeking with Raytheon; nor did he in fact recuse himself from working on the DBD program," which constituted "apparent violations of DoD [Department of Defense] regulations at DoD [Joint Ethics Regulations] 2-204(c) and Federal regulations at 5 C.F.R. §§ 2635.402(c), 2635.604(a), and 2640.103." AR 48047. The CO concluded that VK created a situation of divided loyalty, and that VK's failure to recuse himself was itself grounds for finding an appearance of impropriety. AR 48051 ("VK's failure to recuse himself from the DBD DET contract and the DBD EMD Procurement . . . while financially conflicted created the appearance of impropriety.").

Further, the CO found that VK had a conflict of interests once he knew he was leaving the Navy for Raytheon: "14 days after accepting Raytheon's contingent offer, Government records show that VK continued to personally and substantially participate in the DBD program." AR 48049. The CO identified several specific troublesome instances from this period. VK actively participated in secure email chains discussing

DBD EMD requirements and how to address those requirements at an upcoming Naval Aviation Requirements Group ("NARG") event.  AR 48049.  He sent classified emails "regarding tow length for DBD and proposing that the Government hold a detailed discussion regarding tactics, trade-offs, and decoy areas of concern." *Id.* In another classified email "regarding DBD capabilities and performance parameters," he "provid[ed] his 'initial analysis' related to one of the DBD NARG topics."  AR 48049.

The CO found that VK's participation in such efforts during this post-offer, pre-retirement period did not merely conflict with some of VK's statements, which itself supported a finding of an appearance of impropriety.  Rather, VK's participation was significant enough to have left his fingerprints on the Navy's EMD materials, which would make his work on EMD with Raytheon highly suspicious.  The totality of the circumstances led to the CO's finding that "while financially conflicted, VK provided recommendations and advice on DBD EMD requirements that would be included in the DBD EMD contract and evaluated under the DBD EMD source selection."  AR 48050.  The CO further found that in this period VK "participated personally and substantially in the DBD EMD procurement in which Raytheon's interests are imputed to him by participating in the development of DBD EMD requirements that would be included in the DBD EMD System Performance Specification . . . and evaluated under the DBD EMD source selection."  AR 48050.  Accordingly, the CO found that VK's "failure to recuse himself — that is, continuing to work on DBD efforts while in negotiations and then prospective employ of Raytheon — "created at a minimum the appearance of impropriety."  AR 48051.

To make matters worse, when VK completed his post-government employment questionnaire, he "made no reference whatsoever to his involvement with the DBD program as a Government employee even though he knew or should have known that his new job at Raytheon would entail working Raytheon's DBD program."  AR 48034. VK's evasiveness in this regard, the CO concluded, "as well as the numerous discrepancies and inconsistencies found in VK's declaration compared to the contemporaneous internal Government records identified above weaken the credibility of his assertions in response to this inquiry."  AR 48043-44.

The CO also examined VK's time with Raytheon and his "representations back to the government" in his capacity as DBD Test Director.  AR 48051-58.  He found that VK

> authored work products (e.g., [Contract Data Requirements List] deliverables and briefs), authored and owned Raytheon's proposed changes to the DBD Goals Document, provided contributions to the RFI that resulted in changes to the Government's documents, and represented Raytheon at a number of recurring and nonrecurring events with the Government, such as DBD bi-weekly status meetings, test

15

> events, Program Management Reviews (PMRs), Technical
> Interchange Meetings (TIMs), and DBD milestone events.

AR 48058.[13]

The CO noted that VK's conduct is arguably criminal pursuant to 18 U.S.C. § 207(a) and 5 C.F.R. § 2641.201, which prohibit former government employees from representing contractors before the government on matters in which they "personally and substantially [participated] while employed by the Government." AR 48052 (quoting FAR 3.104-2(b)(3)). If it is arguably criminal, the CO concluded, it is inarguably enough to constitute an appearance of impropriety. Indeed, the CO summarized, "several of these actions consisted of far more than mere 'behind-the-scenes' assistance, constituting an apparent violation of the statute and regulation" and "present, at minimum, an appearance of impropriety." AR 48058.

Finally, drawing on Government Accountability Office ("GAO") categories for conflicts of interest, the CO "considered whether the facts here give rise to a potential unfair competitive advantage because (1) VK had access to non-public competitively useful information; and (2) VK's divided loyalty with Raytheon could have skewed the requirement towards his future employer." AR 48059. He pointed to that fact that VK had "permission to access the restricted, secure sharedrive for the DBD DET source selection containing non-public and proprietary information" and "access to NAWCWD's restricted sharepoint site containing non-public information related to DBD DET performance," AR 48059, which amounted to Raytheon's having "appeared to obtain an unfair competitive advantage in hiring VK based on his access and knowledge of non-public and proprietary competitively useful information." AR 48061.

Determining that "this appearance of a conflict of interest and appearance of impropriety were not avoided" the CO concluded that VK's actions,

> several of which were in apparent violation of Federal and
> DoD regulations, were so egregious, and Raytheon's failure
> to take appropriate action to avoid or mitigate this situation
> was so deficient, that in my opinion the appearance of a
> conflict of interest and impropriety have compounded

---

[13] Raytheon does not contest that VK represented Raytheon to the Navy with respect to EMD. Instead, Raytheon stakes its argument on divorcing DET from EMD and minimizing VK's role on DET while with the Navy. As explained herein, the CO reasonably determined that: (1) DET and EMD are best understood as components of the DBD acquisition; and (2) VK sufficiently participated in DET while employed at the Navy sufficient to create the appearance of a problem for his participation in EMD on Raytheon's behalf. Raytheon makes no other argument to support the propriety of VK's representing Raytheon on EMD.

> beyond the point of any effective mitigation that could now
> be attempted after the fact.

AR 48070.  Pursuant to FAR 3.101-1, which makes the "general rule" of "[t]ransactions relating to the expenditure of public funds . . . to <u>avoid strictly any conflict of interest or even the appearance of a conflict of interest</u> in Government-contractor relationships," the CO did not need to conclude that there was actual impropriety.  AR 48044 (emphasis in original) (quoting FAR 3.101-1).  The CO came close to concluding that there was an actual impropriety, but ultimately did not, instead determining that "this appearance of a conflict of interest and appearance of impropriety were significant and pervasive, and at a minimum created the appearance of a significant unfair competitive advantage for Raytheon."  AR 48071.

The CO, who makes recommendations and decisions regarding the government's conduct of a procurement (including whether to disqualify a particular offer), sent a copy of his findings to the Navy's Criminal Investigative Service and Acquisition Integrity office.  AR 49759. On April 24, 2023, the Director of NAVAIR's Procurement Group ordered the removal of Raytheon from the DBD EMD source selection, AR 50894, and the Navy notified Raytheon of that decision.  AR 50897.[14]

### G.  GAO Protest

Raytheon filed its initial protest with the GAO on May 12, 2023.  AR 51079.  The GAO denied the protest on August 17, 2023, finding that "the record reasonably supports the contracting officer's determination that VK was personally involved in the DBD program as a government employee, with access to non-public and competitively useful information, while, at the same time, VK was seeking and accepting employment with Raytheon to support the program."  AR 51392 (*Raytheon Intel. & Space, Elec. Warfare Self Protect Sys.*, B-421672.1, 2023 WL 5447382 at *6 (Comp. Gen. Aug. 17, 2023)).[15]  The GAO concluded that the Navy "reasonably exercised its discretion to exclude Raytheon in order to avoid even the appearance of impropriety in the DBD EMD competition."  AR 51393.

In making its decision to "not substitute [its] judgment for that of the contracting officer," AR 51392-93, the GAO first found that the CO's investigation was thorough, and his conclusion was based on sufficient information.  AR 51395 ("[T]he contracting officer sought and considered input from Raytheon and BAE Systems, along with information from VK and relevant government personnel; gathered and considered relevant

---

[14] While Raytheon challenges the substance and timing of the Navy's decision to exclude Raytheon, *see infra*, nothing in Raytheon's complaint or subsequent briefs challenges the procedures the Navy employed to exclude Raytheon from the procurement.  *See* Tr. 88:7-16.

[15] The GAO's decision is in the administrative record at AR 51387-401.

documents and emails; sought advice from agency counsel; and performed his own analysis.").

The GAO determined that the CO's factual determinations were reasonable. For one, "the contracting officer reasonably concluded that — even after VK contacted Raytheon regarding potential employment in November 2019 — VK continued to contribute to discussions within the Navy about DBD requirements." AR 51395. Additionally, and importantly, the GAO found there was "nothing unreasonable" about the CO's determination that VK was indeed working on matters related to Raytheon "at the time he contacted Raytheon regarding potential employment in November 2019." AR 51398. Further, the GAO approvingly quoted the CO's finding that VK was not firewalled from DBD matters while at Raytheon, and "even represented and communicated back to the Government to influence the DBD EMD competitive requirement." AR 51397 (quoting AR 48071). These facts, taken together, contributed to the CO's reasonable finding of the appearance of impropriety, even if there was no showing of "direct evidence that VK actually disclosed non-public competitively useful information to Raytheon." AR 51396.

The GAO concluded that the CO's treatment of the DBD program as a single procurement effort (or acquisition) was reasonable: "the weight of evidence the contracting officer assembled regarding the scope of VK's activities in support of DBD and the interrelationship of the DET and EMD phases constituted a reasonable basis to reject Raytheon's and VK's position that VK's involvement in, and access to information about, DBD was limited." AR 51395.

### H. Procedural History

On September 26, 2023, Raytheon brought the instant action in this Court. ECF No. 1 ("Compl."). Raytheon alleged nine counts in its complaint: (1) that the Navy improperly excluded Raytheon for appearance of impropriety, Compl. ¶¶ 192-214 (Count I); (2) that the Navy's exclusion of Raytheon was irrational because VK did not actually have access to "[p]roprietary" information, Compl. ¶¶ 215-22 (Count II); (3) that the Navy's decision was irrational because "the record of the investigation does not demonstrate that VK was substantially and personally involved in either the DET or EMD procurements" Compl. at 47, ¶¶ 223-42 (Count III); (4) that no "hard facts" show VK's having "participated in the EMD procurement, much less skewed the specifications in the favor of a prospective employer," Compl. at 50-51, ¶¶ 243-47 (Count IV); (5) that VK's employment at Raytheon had no effect on the EMD, Compl. ¶¶ 248-55 (Count V); (6) that the Navy improperly did not consider whether "there were significant facts presented to the Navy that rebutted the presumed prejudice arising from an alleged appearance of a conflict," Compl. ¶ 259 (Count VI); (7) that the Navy's "undue delay" in identifying a potential conflict of interest "deprived Raytheon of any opportunity to mitigate" the problem, Compl. ¶ 273 (Count VII); (8) that such a delay amounted to a denial of

Raytheon's "due process rights," Compl. at 57, ¶¶ 274-86 (Count VIII); and (9) that the Navy's exclusion of Raytheon "effectively resulted in a sole source procurement" in violation of the Competition in Contracting Act and FAR 9.504. Compl. ¶¶ 287-97 (Count IX).

On September 27, BAE, the putative awardee, moved to intervene. ECF No. 9. Raytheon moved for judgment on the administrative record on November 22, 2023. ECF No. 46 ("Pl. MJAR"). On December 8, 2023, BAE filed its cross-motion for judgment on the administrative record and response, ECF No. 49, and the government filed its cross-motion and response that same day. ECF No. 52. Raytheon filed its response and reply on December 15, 2023. ECF No. 53 ("Pl. Resp."). BAE filed its reply on December 22, 2023, ECF No. 55, and the government filed its reply later that day. ECF No. 57. The Court held oral argument on the parties' MJARs on January 31, 2024. ECF No. 66. Following oral argument and at the Court's direction, the parties filed supplemental briefs regarding some details of VK's work on DBD. ECF Nos. 62-64.[16]

## II.   JURISDICTION & STANDING

The Tucker Act provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").

To establish "interested party" standing in a § 1491(b) action, a plaintiff must allege facts demonstrating that it is "an actual or prospective bidder" with a "direct economic interest" in the procurement. *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (quoting *Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)).[17] In the pre-award context, it is sufficient to allege a "non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361–62 (Fed. Cir. 2009); *but see Oracle America, Inc. v. United States*, 975 F.3d 1279, 1291 n.3 (Fed. Cir. 2020) (explaining that a court should apply the "substantial chance" test if there is an "adequate factual foundation" to do so).

---

[16] These supplemental briefs contained classified information, the details of which are not essential to resolving this case. The Court addresses the arguments in these briefs without referencing any classified information.

[17] *But see CACI, Inc.-Fed. v. United States,* 67 F.4th 1145, 1151 (Fed. Cir. 2023) ("Our prior caselaw treating the interested party issue as a jurisdictional issue . . . is no longer good law in this respect." (citations omitted)).

In this case, under any test, Raytheon demonstrates that it has both Article III and statutory standing to pursue its action challenging its exclusion from the procurement at issue. Neither the government nor BAE challenges Raytheon's standing or this Court's jurisdiction. Based on the allegations contained in the complaint and the facts in the administrative record, this Court proceeds to resolving this case on the merits.

## III.   STANDARD OF REVIEW

### A.   Administrative Procedure Act Review

Pursuant to 28 U.S.C. § 1491(b)(4), this Court applies the standard of review contained in the Administrative Procedure Act ("APA") § 10(e), 5 U.S.C. § 706. *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). In accordance with the APA, this Court reviews an agency's procurement decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A plaintiff succeeds on the merits where it demonstrates that either: "(1) the [agency]'s decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).

An agency's decision is arbitrary and capricious under the APA standard of review if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (quoting *Ala. Aircraft Indus.*, 586 F.3d at 1375); *Sharpe v. United States*, 935 F.3d 1352, 1358–59 (Fed. Cir. 2019).

### B.   The Role of the Administrative Record and this Court's Fact Finding

This Court conducts its APA assessment of the government's challenged procurement decision(s) — in an action pursuant to 28 U.S.C. § 1491(b) — via motions for judgment on the administrative record, RCFC 52.1(c), a process "properly understood as intending to provide for an expedited trial on the record." *Bannum*, 404 F.3d at 1356. The process is "designed to provide for trial on a paper record, *allowing fact-finding by the trial court.*" *Id.* (emphasis added). In deciding cross-motions for judgment on the administrative record, this Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020) (quoting *Palantir USG*,

*Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018)); *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).

The primary difference between a typical trial and one conducted on the administrative record is that, in the latter, new evidence ordinarily may not be considered.  Both the nature of APA review and this Court's rules "restricts the evidence to the agency record, as may be supplemented consistent with [the law of this circuit]." *Bannum*, 404 F.3d at 1356.

## C.  Determining Prejudice on the Merits

The Federal Circuit has instructed that "[t]he trial court [is] *required* to determine whether . . . errors in the procurement process significantly prejudiced [a plaintiff]." *Bannum*, 404 F.3d at 1353 (emphasis added); *id.* at 1356 (holding that "the trial court [is required] to make factual findings on prejudice from the record evidence").[18]  In a post-award protest, the plaintiff bears the burden of showing not only that the agency's decision is flawed under the APA standard of review but also that some prejudice flowed from that error.  In short, a plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the errors."  *Id.* at 1353 (citing *Info. Tech.,* 316 F.3d at 1319, and *Alfa Laval,* 175 F.3d at 1367).[19]

The Federal Circuit has recently reconfirmed not only that a plaintiff bears the burden to prove prejudice, but also that the rule is based firmly on Supreme Court precedent:

> The standards of the [APA] set forth in 5 U.S.C § 706 govern
> judicial review of agency action in bid protests.  28 U.S.C.

---

[18] Thus, the Federal Circuit noted that it "reviews such [factual] findings for clear error."  *Bannum*, 404 F.3d at 1354 ("Nor should the review of a Court of Federal Claims prejudice determination be premised on an 'arbitrary and capricious' review.  That review standard goes to the agency's compliance with the law, whereas the prejudice determination assesses whether an adjudged violation of law warrants setting aside a contract award."); *id.* at 1357 ("[T]he trial court's factual determination on prejudice . . . is entitled to review for clear error like any finding in a bench trial, and the special concerns applicable to bid protest actions do not alter that review here.").

[19] *See also Noble Supply & Logistics LLC v. United States*, 168 Fed. Cl. 439, 447 (2023) ("[T]he court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record." (citing *Bannum*, 404 F.3d at 1355)); *Navarre Corp. v. United States*, 168 Fed. Cl. 361, 367-68 (2023) (explaining that "the parties are limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record" and "will then determine whether a party has met its burden of proof based on the evidence in the record" (*Bannum*, 404 F.3d at 1354-55)); *Karthik Consulting, LLC v. United States*, 168 Fed. Cl. 95, 103 (2023) ("The protestor has the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency's decision.").

§ 1491(b)(4).  The APA provision mandates that when a court reviews agency action for being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "due account shall be taken of the rule of prejudicial error."  5 U.S.C.  § 706. The Supreme Court has explained that the prejudicial-error rule applies the harmless-error standard to review of administrative agency action.  *Shinseki v. Sanders*, 556 U.S. 396, 406–07, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009).  In particular, the challenger of agency action generally bears the burden of showing that an error was harmful—that is, that it was prejudicial.  *Id.* at 409–10, 129 S.Ct. 1696.

*Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996–97 (Fed. Cir. 2021) (explaining that Federal Circuit "precedent accord[s] with the APA mandate" and "prescribe[s] a two-step process when deciding whether to set aside a contract award, covering both irrationality errors and legal errors" (citing *Bannum*, 404 F.3d at 1351, among other decisions)).

Determining whether an agency's error was prejudicial to the plaintiff "is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation,* 22 F.4th at 996–97 (citing *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 n.6 (Fed. Cir. 2021) ("The APA does not provide an exception to the prejudicial-error rule for arbitrary and capricious action.")).  Specifically, "[d]emonstrating prejudice" requires that "the plaintiff show more than a bare possibility of receiving the award." *Id.* (citing *Bannum*, 404 F.3d at 1358, where the Federal Circuit affirmed the trial court's determination that the plaintiff had not demonstrated a substantial chance of award because its "argument rest[ed] on mere numerical possibility, not evidence").

The Federal Circuit provided this summary of the required prejudice analysis when resolving the merits of an action pursuant 28 U.S.C. § 1491(b):

> [T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision. The protestor must show prejudice under the usual standard. The Supreme Court has noted that, at least in some contexts, prejudice will be easily shown because the circumstances will make prejudice readily apparent. *Shinseki*, 556 U.S. at 410, 129 S.Ct. 1696. But even if that may sometimes be true in particular bid-protest cases, there is no starting point of presumed prejudice.

*Sys. Stud. & Simulation,* 22 F.4th at 998.  The Federal Circuit further reaffirmed that it "review[s] the legal standard for prejudice de novo," but this Court's "factual findings underlying the prejudice determination for clear error." *Id.* (citing *WellPoint Military Care Corp. v. United States,* 953 F.3d 1373, 1377 (Fed. Cir. 2020) (citing *Bannum,* 404 F.3d at 1353–54)).[20]

## IV. DISCUSSION: THE GOVERNMENT IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD BECAUSE THE NAVY REASONABLY EXCLUDED RAYTHEON FROM THE PROCUREMENT BASED ON THE APPEARANCE OF IMPROPRIETY OR A CONFLICT OF INTEREST

### A.  Statutory and Regulatory Principles

One of the primary "guiding principles" of the "Federal Acquisition System is to deliver on a timely basis the best value product or service to the customer, *while maintaining the public's trust* and fulfilling public policy objectives."  FAR 1.102(a) (emphasis added).  Indeed, the system is designed to "[c]onduct business with integrity, fairness, and openness."  FAR 1.102(b)(3).  "An essential consideration in every aspect of the System is maintaining the public's trust.  Not only must the System have integrity, but the actions of each member of the [Acquisition] Team must reflect integrity, fairness, and openness."  FAR 1.102-2(c)(1).  Cognizant contracting officers and other members of the government's acquisition team are "empowered to make acquisition decisions within their areas of responsibility, including selection, negotiation, and administration of contracts consistent with the Guiding Principles."  FAR 1.102-5(a); *see also* FAR 1.602-1(a) (providing that "[c]ontracting officers have authority to enter into, administer, or terminate contracts and make related determinations and findings").  Contracting officers thus "are responsible for . . . safeguarding the interests of the United States in its contractual relationships" and, in that regard, are "allowed *wide latitude* to exercise business judgment" to protect the integrity of the procurement process.  FAR 1.602-2 (emphasis added); *see also* FAR 1.602-2(b) (providing that "[c]ontracting officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment").

Several FAR provisions address procurement integrity and, relatedly, conflicts of interest, both personal and organizational.  *See* FAR part 3 ("Improper Business Practices and Personal Conflicts of Interest"); FAR 9.5 ("Organizational and Consultant Conflicts of Interest").  In particular, the Court notes the following relevant FAR provisions:

- "Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The

---

[20] In *Sys. Stud. & Simulation, Inc.,* the Federal Circuit, based on the trial court's specific fact findings, "conclude[d] that the Claims Court did not err when it determined that the irrational assignment of the particular strength at issue to CAE was harmless error." 22 F.4th at 998.

general rule is to avoid strictly any conflict of interest *or even the appearance of a conflict of interest* in Government-contractor relationships." FAR 3.101-1 (emphasis added).

- "[N]o Government employee may solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who . . . has or is seeking to obtain Government business with the employee's agency [or] has interests that may be substantially affected by the performance or nonperformance of the employee's official duties." FAR 3.101-2.

- "If an agency official, participating personally and substantially in a Federal agency procurement for a contract in excess of the simplified acquisition threshold, contacts or is contacted by a person who is an offeror in that Federal agency procurement regarding possible non-Federal employment for that official, the official must— (i) Promptly report the contact in writing to the official's supervisor and to the agency ethics official; and (ii) Either reject the possibility of non-Federal employment or disqualify himself or herself from further personal and substantial participation in that Federal agency procurement (see [FAR] 3.104–5) . . . ." FAR 3.104-3(c).

Although, as noted *supra,* FAR 9.5 generally addresses organizational, and not individual, conflicts of interest, there are "two underlying principles" animating the government's conflicts concerns: "(a) Preventing the existence of conflicting roles that might bias a contractor's judgment; and (b) Preventing unfair competitive advantage." FAR 9.505. With respect to the latter, "an unfair competitive advantage exists where a contractor competing for award of any Federal contract possesses— (1) Proprietary information that was obtained from a Government official without proper authorization; or (2) Source selection information (as defined in 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract." FAR 9.505(b)(1)-(2).[21]

These FAR provisions, among others, implement a variety of statutory and regulatory provisions, including: 41 U.S.C. § 2102 ("Prohibitions on disclosing and obtaining procurement information"); 41 U.S.C. § 2103 ("Actions required of procurement officers when contacted regarding non-Federal employment"); 41 U.S.C. § 2105 ("Penalties and administrative actions"); 18 U.S.C. § 207 ("Restrictions on former officers, employees, and elected officials of the executive and legislative branches"); 18 U.S.C. § 208 ("Acts affecting a personal financial interest"); and 5 C.F.R. part 2365 ("Standards of Ethical Conduct for Employees of the Executive Branch"). *See, e.g.,* FAR 3.104-2 (discussing these and various other statutory and regulatory provisions).

---

[21] *See also* FAR 9.505-4 ("Obtaining access to proprietary information").

FAR 3.104-7 requires a contracting officer to "determine" whether "a violation or possible violation of 41 U.S.C. [§§] 2102, 2103, or 2104 (see [FAR] 3.104–3) . . . has any impact on the pending award or selection of the contractor" and specifies procedures and remedies where "the contracting officer concludes that the violation or possible violation impacts the procurement."  FAR 3.104-7(a); *see also* FAR 3.104-7(d)-(e) (providing that "[t]he [head of the contracting activity ("HCA")] should recommend or direct an administrative or contractual remedy commensurate with the severity and effect of the violation").[22]

Reviewing the potentially applicable provisions to the facts of this case, what emerges are at least three different buckets of problems that may give rise to a contracting officer's taking action to exclude a would-be offeror or vendor from a procurement: (1) an *actual* impropriety or conflict of interest; (2) an *apparent, possible, or potential* impropriety or conflict of interest; and (3) the mere *appearance* of impropriety or conflict of interest.[23]  There are differences between all three categories, but the pertinent distinction in this case is between the second and third categories.  *Apparent* impropriety comprises scenarios in which there are at least some facts suggesting the need for further investigation and a determination of whether there is an actual violation or where the facts indicate that a conflict may arise in the future.  For example, the GAO has explained that "[t]he OCI regulations require that, where an actual or apparent conflict of interest arises, the agency is required to carefully analyze the situation and either take action to avoid, neutralize or mitigate any possible advantage that might accrue from the circumstances, or make a specific determination to waive the application of the OCI requirements where the head of the contracting agency determines that it is in the best interests of the government to do so."  *Ktech Corp.*, B-285330, 2002 CPD ¶ 77, 2000 WL 33767828, at *2 (Comp. Gen. Aug. 17, 2000) (quoting citing FAR 9.503 and FAR 9.504(a)).[24]

---

[22] The Procurement Integrity Act, Pub.L. No. 100–679, § 6, 102 Stat. 4063–69 (Nov. 17, 1988), is codified, as amended, at 41 U.S.C. ch. 21 (§§ 2101-2107) and implemented by FAR 3.104 ("Procurement integrity").  *See also* FAR 3.104-2(b)(3) (noting that "[p]ost-employment restrictions are covered by 18 U.S.C. 207 and 5 CFR parts 2637 and 2641, [which] prohibit certain activities by former Government employees, including representation of a contractor before the Government in relation to any contract or other particular matter involving specific parties on which the former employee participated personally and substantially while employed by the Government"); FAR 3.703 (providing authority for "the head of the agency, or designee" to rescind a contract where he or she "has determined, based upon a preponderance of the evidence, that the contractor or someone acting for the contractor has engaged in conduct constituting" a violation of 41 U.S.C. § 2102).

[23] *See* FAR 3.000 (explaining that "[t]his part prescribes policies and procedures for avoiding improper business practices and personal conflicts of interest and for dealing with their *apparent or actual* occurrence" (emphasis added)); *see also* Tr. 10:13-22 (Counsel for Raytheon agreeing that the "FAR . . . contemplates that [the CO] can find a *potential* violation that impacts the procurement[] that warrants exclusion for an offeror" (emphasis added)).

[24] "Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract.  The exercise of common sense, good judgment, and

In contrast, the *appearance* of impropriety (or conflict of interest), by definition, means that an objective observer might believe there is an impropriety, even where the facts, when fully investigated, would not support a finding of an *actual* legal violation or impropriety in the procurement.

While it is no surprise that a CO or HCA may take steps to address an *actual* impropriety or violation of law impacting a procurement, it is less obvious that the government may also take steps to remedy a possible or potential impropriety or conflict, *see, e.g.*, FAR 3.000, FAR 3.104-7,[25] or even the mere *appearance* of an impropriety or conflict.  Yet it may. The FAR provides that "[t]he general rule is to avoid *strictly* any conflict of interest or *even the appearance of a conflict of interest* in Government-contractor relationships." FAR 3.101-1 (emphasis added).[26]

In *NKF*, the Federal Circuit unequivocally rejected the argument that the law "prohibits a bid rejection based merely on the *appearance* of impropriety." 805 F.2d at 376. In so holding, the Federal Circuit in *NKF* read its prior decision in *CACI, Inc.-Federal v. United States*, 719 F.2d 1567 (Fed. Cir. 1983), "as merely prohibiting the agency from rejecting the relevant bidder where the facts of the case do not support a finding of an appearance of impropriety."  *NKF*, 805 F.2d at 376 ("Under the facts at issue here, we cannot say that the agency's conclusion, that there was an appearance of impropriety, was unreasonable or irrational.").  Thus, in *NKF*, the Federal Circuit concluded that the agency did not have to show that a particular former government employee actually violated 18 U.S.C. § 208, in order to justify excluding his employer from a procurement. *Id.*  Plaintiff NKF had argued that the former government employee it had hired "was not 'substantially' participating in the contract at the time he was negotiating for employment," *id.*, but the Federal Circuit concluded that fact was irrelevant: "Though

---

[25] sound discretion is required in both the decision on whether a significant *potential* conflict exists and, if it does, the development of an appropriate means for resolving it."  FAR 9.505 (emphasis added).

[25] *See also* FAR 9.502(c) ("An organizational conflict of interest may result when factors create an actual *or potential* conflict of interest on an instant contract, or when the nature of the work to be performed on the instant contract creates an actual *or potential* conflict of interest on a future acquisition." (emphasis added)).

[26] *Cf.* FAR 3.104-5(c)(2) ("the HCA must consider any factors that create an appearance that the disqualified official acted without complete impartiality in the procurement"); FAR 3.601(a) (providing that "a contracting officer shall not knowingly award a contract to a Government employee or to a business concern or other organization owned or substantially owned or controlled by one or more Government employees" and explaining that "[t]his policy is intended to avoid any conflict of interest that might arise between the employees' interests and their Government duties, *and to avoid the appearance of favoritism* or preferential treatment by the Government toward its employees" (emphasis added)).

that may matter for determining a violation of 18 U.S.C. § 208, it does not make irrational the agency's conclusion that an appearance of impropriety existed." *Id.* at 376–77.[27]

Recognizing that *NKF*, 805 F.2d 372, presents a considerable obstacle to its central claim, Raytheon urges the Court to adopt a narrow reading of that case. Raytheon's contention is that *NKF* allows a CO to exclude an offeror from a procurement based on an appearance of impropriety only where there are "hard facts" that "establish the likelihood the hiring of the former government official [actually] tainted the procurement; it is not enough that the circumstances look suspicious." Pl. MJAR at 20. There are two arguments implicit in that line. First, facts must be asserted at some level of specificity to transcend merely looking suspicious. *Id.* at 20-21 (noting "hard facts" in *NKF* such as the conflicted individual having "served as the CO's technical representative and the chair of the contract award review panel . . . and was 'a major cog in the bid process, with access to much relevant information'" (quoting 805 F.2d at 379)). Second, there must be some indication of a concrete taint in the bidding process. *Id.* at 21 (observing that in *NKF* "the new employer dropped its price by 33% after hiring the former official" (quoting 805 F.2d at 379)).

Raytheon's reading of *NKF* is overly narrow and not supported by subsequent case law. Of course, the Court agrees that the agency must base its decision to exclude an offeror from a procurement on "hard facts." But that only means that inferences and innuendo will not suffice. Here, there is no doubt that the CO justified his decision with hard facts, which are counted and recounted *supra*. Raytheon's second argument is bolder. Raytheon elaborated on it in response to the government's broad reading of *NKF*:

> The government is correct that in *NKF Engineering* there was no evidence the former government employee provided competitively useful, non-public information to a contractor. But the facts were clear that the former employee (1) had such information *and* (2) after he was hired by a participant in an ongoing procurement, the contractor dramatically lowered its pricing and improved its ranking relative to other offerors to

---

[27] In *NKF*, the Federal Circuit anchored the CO's power to exclude an offeror for the mere appearance of impropriety in FAR 1.602-2. 805 F.2d at 377 (discussing trial court's decision and concluding that "[]though the Claims Court erroneously limited that power to cases involving actual, but not the appearance of, impropriety, we do not repeat that mistake here"). As discussed above, there are yet other FAR provisions that support the Federal Circuit's holding in *NKF*. *Oak Grove Technologies, LLC v. United States*, 155 Fed.Cl. 84, 115 (2021) (explaining that FAR 3.101-1 "instructs that "[t]he general rule is to avoid strictly any conflict of interest *or even the appearance of a conflict of interest in Government-contractor relationships*" and citing *NKF* for the proposition that "these objectives are so central to the procurement system as a whole that even the mere appearance of impropriety can be sufficient grounds to disqualify an offeror").

> such an extent that the act of lowering its pricing
> demonstrated the potential impact to the procurement.

Pl. Resp. at 14 (citing *NKF*, 805 F.2d at 379).  Raytheon summed up its reading of *NKF* thus: "whether alleging an actual or apparent impropriety, the contracting officer must identify an actual or apparent *impact* to the procurement."  *Id.* at 15 (emphasis added).

Though the Federal Circuit itself could have crafted a narrow holding in *NKF* based on that case's underlying facts, the plain language of its decision runs in the opposite direction, and provides a government agency with much broader authority to police the appearance of impropriety.  Thus, in *NKF*, the Federal Circuit held that an "agency's conclusion, that there was an appearance of impropriety," should only be overturned if it "was unreasonable or irrational."  805 F.2d at 376.  The Federal Circuit's explanation of its own holding is general and broad: the "appearance of and potential for an unfair competitive advantage so tainted the procurement process that the integrity of the process had been damaged."  *Id.* at 375.  Indeed, addressing the facts in *NKF* to which Raytheon points, the Federal Circuit held that "[w]hether or not inside information was actually passed from [the former government employee] to NKF, the appearance of impropriety was certainly enough for the CO to make a rational decision to disqualify NKF."  *Id.* at 376.  There are yet additional indications that our appellate court did not intend to tie an agency's hands.  *See id.* at 377-78 (noting that "[t]he CO was sensitive, as common sense compels him to be, to the integrity of the bidding process—an integrity attached not only to [the RFP at issue] but also to the bidding procedure of the entire government" and that "[t]he CO's decision to disqualify NKF because of an appearance of impropriety was not irrational, arbitrary or capricious").  There is no suggestion that an agency must find evidence of an actual impact to the procurement, whether with regard to price or otherwise.  To the contrary, the Federal Circuit's *NKF* decision is replete with language suggesting that the CO has wide latitude to make a finding of the appearance of impropriety and to exclude an offeror on that basis; as long as such a finding is rational, this Court must uphold it.

Moreover, this Court has long declined to read *NKF* narrowly, and the approach it takes today has been standard practice for decades.  *See, e.g., Compliance Corp. v. United States*, 22 Cl. Ct. 193, 203 (1990) ("attempting to obtain proprietary information" from incumbent contractor sufficient pursuant to *NKF* to "create[] the appearance of impropriety which necessitated the disqualification of Compliance to protect the integrity of the procurement process"), *aff'd*, 960 F.2d 157 (Fed. Cir. 1992); *SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 668 (2021) (citing *NKF* for the proposition that "a contracting officer has broad authority to protect the integrity of the procurement process, including the authority to disqualify an offeror based on an impropriety or an appearance of impropriety in the procurement"), *aff'd*, 2023 WL 6632915 (Fed. Cir. Oct. 12, 2023); *CACI, Inc. v. United States*, 2023 WL 4624485, at *12 (Fed. Cl. July 20, 2023) (citing *NKF* for the proposition that "[b]ut for irrationality, a CO's conflict of interest

determination will be upheld on judicial review").  Though some of this Court's decisions have distinguished *NKF*, none adopt Raytheon's creative reading, which would require an impact to the procurement. *See, e.g.*, *Turner Const. Co. v. United States*, 94 Fed. Cl. 561, 573 (2010) (characterizing the combination of "an employee who was a 'major cog in the bid process, with access to much relevant information'" and "the 'drastic bid reduction'" in *NKF* as an example of "hard facts" that indicate appearance of impropriety, but maintaining that "'hard facts' do not need to show either an actual conflict or a negative impact from a conflict"), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011).

What all of this points to is broad discretion for the government to act to protect the integrity of a procurement.  Indeed, overturning a CO's finding of appearance of impropriety would be a novel approach for this Court in the post-*NKF* era.  In fact, as far as this Court's research has turned up, we have *never* overturned an agency's finding of an appearance of impropriety.[28]  Rather, contracting officers have enjoyed nearly unlimited discretion to exclude bidders for appearance of impropriety.  As long as the CO relies on reasonable factual predicates and avoids irrationality in coming to a conclusion, this Court will defer to that conclusion.

In sum, the Court declines to adopt Raytheon's reading of *NKF*, which is not supported by the Federal Circuit's explanation for its landmark decision, nor this Court's subsequent interpretations of it.[29]

---

[28] Tr. 121:7-16 (Raytheon counsel's agreeing that "you don't find those cases").  Although Raytheon at one point cited to Judge Horn's decision in *CNA Corp. v. United States*, 81 Fed. Cl. 722 (2008), Tr. 90, the government in that case relied on *NKF* only to demonstrate the breadth "of the contracting officer's discretion."  81 Fed. Cl. at 732.  Indeed, *CNA* did not involve the government's removal of an offeror from a procurement based on the mere *appearance* of impropriety and thus did not implicate *NKF*.  *See CNA Corp.*, Fed. Cl. No. 08-249, ECF No. 13 at 31 (government brief arguing that "the agency reasonably determined that [a scientist] properly was excluded from performing as a principal investigator on a contract . . . due to a possible, future violation of 18 U.S.C. [§] 207(a)(1)"); *see also* 81 Fed. Cl. at 733 (ordering that the government "shall not exclude [the offeror] on the basis of the post-employment restrictions of 18 U.S.C. § 207(a)(1)").  The undersigned knows this well because he lost the case as counsel of record for the government before Judge Horn.

[29] Raytheon during oral argument agreed that "we're not saying that [the Court] ha[s] to find an actual violation" but nevertheless asserted that the Court "ha[s] to perform an impact analysis." Tr. 160:1-3.  The Court tried to get Raytheon to explain the practical difference between an actual conflict or impropriety — a finding that is *not* required to support the exclusion of an offeror for the appearance of impropriety —  and the "impact analysis" Raytheon asserts *is* required, but Raytheon could not do so.  Tr. 164:19-25 (Raytheon arguing that an appearance of impropriety arises when "there was an effect on the competition or there could be an effect on the competition").

Although a CO's power to protect the integrity of a procurement is broad, the exclusion of a would-be offeror due to an appearance of impropriety must be based on "hard facts" and not "suspicion and innuendo." *CACI*, 719 F.2d at 1581–82. There is no appearance of impropriety when "[a] disinterested observer knowing all the facts and the applicable law would see nothing improper." *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1324 (Fed. Cir. 2003). But again, the "'hard facts' do not need to show an actual conflict." *Turner Const. Co*, 645 F.3d at 1387. Rather, a potential conflict or the appearance of impropriety "can be sufficient." *Id.* The "hard facts" requirement simply means that a finding of appearance of impropriety must be grounded in specific facts that a reasonable person would conclude cast doubt on the integrity of the bidding process. *CACI*, 719 F.2d at 1581-82.

Finally, although VK relies on the agency's ethics opinion, when a current or former government employee seeks advice from a government agency ethics official, "[t]he request for an advisory opinion must be in writing, *include all relevant information* reasonably available to the official or former official, and be dated and signed." FAR 3.104-6(b) (emphasis added). Such a "request must include information about the . . . [p]rocurement(s) . . . involving the particular contractor, in which the individual *was or is* involved, including contract or solicitation numbers, dates of solicitation or award, a description of the supplies or services procured or to be procured, and contract amount[.]" FAR 3.104-6(b)(1) (emphasis added).[30]

## B.  The CO's Determinations and Findings are Reasonable

Pursuant to the APA standard of review outlined above, there are essentially three routes Raytheon may take to successfully challenge the CO's determination at issue. Raytheon could attempt to show that the CO's findings of fact are not supported by the administrative record and thus amount to no more than "suspicion and innuendo." *CACI*, 719 F.2d at 1582. Raytheon could attack the CO's understanding of the applicable legal framework. And finally, Raytheon could show that, to the extent the law permits the CO — and, by extension, the agency — some discretion in deciding to exclude an offeror from the procurement, the agency abused its discretion here.

None of Raytheon's shots hit their targets. The Court concludes that the CO's rationale for recommending Raytheon's exclusion from the EMD phase of the DBD procurement — and the Director of NAVAIR's Procurement Group's adoption of that recommendation — was reasonable. First, and contrary to Raytheon's argument, the CO reasonably concluded that the DBD program is best understood as a single procurement with multiple phases. Second, the CO's findings of fact regarding VK's activities while a Navy employee — and subsequently of Raytheon — are adequately supported by

---

[30] As discussed *infra*, VK did *not* disclose "all relevant information" to the agency ethics official from whom VK sought guidance. FAR 3.104-6(b).

administrative-record evidence, and therefore reasonable. Third, the CO's characterization of those facts — *e.g.*, the determination that VK's involvement in DBD was "substantial" — was also reasonable. In sum, Raytheon has failed to carry its burden to demonstrate that the Navy's determination to exclude Raytheon from the procurement at issue was arbitrary, capricious, or otherwise contrary to law.

### 1. The CO reasonably viewed DBD as a single program, or as one procurement with multiple phases.

Raytheon essentially argues that the CO's decision at issue is irrational because, among other things, it blurs the DET and EMD phases of the DBD procurement. Raytheon views these two phases as separate, unrelated procurements, where one has little or no bearing on the other. Pl. MJAR at 28 ("The Navy did not issue the *draft* solicitation for the EMD procurement until *more than a year* [after VK had departed the Navy], on April 16, 2021."). According to Raytheon, whatever information, access, and influence VK may have had regarding the DET program during his Navy employment, that stage of his professional life was over once he joined Raytheon. Raytheon thus attempts to undermine the CO's finding that VK's work on DET while with the Navy could give rise to the appearance of impropriety once he switched sides to Raytheon to work on EMD. This argument, however, merely begs the question whether the CO reasonably viewed the DBD program as essentially a single procurement.

Raytheon's view is not unreasonable, but that does not lead to the ineluctable conclusion that the CO's determination is unreasonable and must be set aside. To the contrary, the CO's conclusion that the DET and EMD phases of DBD are "interrelated" is also reasonable. AR 48045. Indeed, there is substantial evidence in the administrative record and logic in the CO's determination and findings that support his conclusion about the nature of the DBD procurement. For example, the record contains ample evidence that prior to the start of the DBD program, all parties to this case — the Navy, BAE, and Raytheon — understood that there would be an EMD phase building directly on the results of the earlier DET phase. *See* AR 160.14, 160.46, 282, 719, 3398-99, 3400, 3417, 3425-26, 3429. This has long been understood as a reason to view two contracts as phases of the same procurement. *See* U.S. Office of Government Ethics, *Letter To An Inspector General*, OGE Informal Advisory Letter 05 X 6, 2005 WL 4169815, at *7 (Sept. 19, 2005) ("Although follow-on contracts are generally viewed as separate matters, if there is some indication that one contract directly contemplated the other contract or if there are other circumstances indicating that two contracts are really part of the same proceeding involving specific parties, then two contracts may be viewed as the same particular matter."). Significantly, in that regard, the NDA that VK signed prior to beginning his work on DBD did not distinguish between phases, but rather referenced only "DBD"

generally, all but demonstrating that the Navy and VK understood DBD as a unitary procurement effort with multiple parts.  AR 48269.[31]

Further, the CO thoroughly explained *why* the "two competitive efforts (DBD DET and DBD EMD) . . . are interrelated."  AR 48045.  The CO described how the Navy used an "evolutionary approach" to explain how the "two different contracts . . . are two phases of one continuous development effort from an acquisition standpoint."  *Id.* Crucially, "[t]he DBD DET contracts included a DBD Goals Document that provided detailed goals to address capabilities compatible with the current and future DBD mission needs; as such, it set the baseline for what would become the DBD EMD System Performance Specification."  *Id.*[32]  The CO rejected Raytheon's argument that EMD is a separate procurement (that does not include pre-solicitation activities) with a reasonable reading of the FAR.  FAR 2.101 provides:

> Acquisition means the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease . . . Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration and those technical and management functions directly related to the process of fulfilling agency needs by contract.

AR 48045-46 (quoting FAR 2.101).  This is the very definition of a procurement.  Indeed, the FAR's definition of "procurement" directs us to the above-cited definition of "acquisition."  *See* FAR 2.101 ("*Procurement* (see 'acquisition')"); *see also Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (adopting statutory definition of "'procurement' [which] includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout" (quoting 41 U.S.C. § 403(2), *recodified at* 41 U.S.C. § 111)).  Because the FAR uses "procurement" and "acquisition" interchangeably, Raytheon cannot split hairs about VK's participating in a DBD "acquisition" but not the specific DBD "procurement" (or vice versa).  Rather, the DBD procurement began with the establishment of agency needs (before DET) and continued through multiple

---

[31] The "DBD" subject line of VK's email to Raytheon human resources further suggests that VK himself viewed DBD as a single, extended procurement.  AR 48152.

[32] The Court notes that this very Goals Document, which links the DET and EMD through its incorporation of information gathered through DET to set baselines for EMD, is precisely what the CO found VK worked on — for both employers.  AR 48046, 48056.

contracts, including EMD.  VK's participation in part of DBD (*i.e.*, DET) therefore has some bearing on the EMD acquisition. With an explanation grounded in an understanding of the Navy's procurement operations and the text of the FAR, the CO's D&F is not susceptible to second-guessing.

All of this supports the CO's conclusion that VK's involvement in the DET phase "compromised the integrity of the DBD EMD Source Selection such that the Government is now required to neutralize what, at minimum, is the appearance of a significant unfair competitive advantage for Raytheon."  AR 48072.  Again, none of this is to say that the Court would have reached this conclusion in the first instance, or that it is the only reasonable conclusion.  On this record, however, the CO's conclusion is certainly a reasonable one, which is all the Navy needs to prevail here.

### 2.    The CO's factual findings are supported by the record.

As summarized in the Court's fact-finding section, *supra*, a host of facts underlying the CO's D&F are undisputed.  Indeed, counsel for Raytheon had the opportunity at oral argument to dispute any and all facts as described in the D&F, but seriously contested only one. Tr. 16:8-9.[33]  In particular, the only part of the CO's D&F that Raytheon argued is factually incorrect is the CO's finding that VK had access to NAWCWD's sharedrive and maintained access throughout his employment with the Navy.  AR 48047-48; *see* Tr. 16:8-59:10 (argument over this issue).  The CO based this finding on a declaration of the Navy's project lead for DBD DET contracts, which included a clear assertion that, to the declarant's knowledge, VK "had access to NAWCWD's access-restricted sharepoint site while he was a Government employee." AR 49780.  The declaration did not mention any revocation of that access.

Furthermore, despite Raytheon's arguments to the contrary as noted *supra*, the CO "did not locate any documentation showing that VK's access to the sharedrive or the NAWCWD sharepoint site was ever severed prior to his retirement from the Government."  AR 48060.  The declaration, and the absence of evidence that VK ever asked for his access to be removed or that he in fact had his access restricted, constitutes sufficient evidence for the CO to find that the DBD procurement was tainted with an appearance of impropriety.  *NKF*, 805 F.2d at 377.  The CO's rejection of VK's version of

---

[33] Raytheon arguably contested a second fact: the CO's finding that VK supported the DBD program until February 2020.  Tr. 74:24-75:12.  But because there is clear factual evidence that VK sent emails regarding DBD at that time, *see* Tr. 81:4-21; *see also* AR 48033-34, this is better understood as an argument about whether the support VK provided was material, or, in other words, an argument about the CO's analysis of the facts. *See* Tr. 78:1-6 (Raytheon agreeing that only VK's declarations contradict the CO's finding and, even then, only "to the extent that . . . they're given appropriate weight"); Tr. 84:3-11.  VK's self-serving declarations, however, are not sufficient to render the CO's factual findings arbitrary and capricious.

events is reasonable, further, as VK's story regarding his sharedrive access changed substantially over time.  First, he claimed that he "was not granted access to this server" and thus "had no access to any responses from any bidder associated with the Navy's DBD DET procurement."  AR 48086.  Later, however, VK admitted he did, in fact, have access to the proprietary information at some point, but that his access was later revoked.  AR 49609.  The CO's finding that VK's inconsistency detracts from his credibility is eminently reasonable.  *See* AR 48048.

In any case, contrary to Raytheon's argument, Pl. MJAR at 5-6, Raytheon cites no source of law requiring this Court to accept VK's word over the CO's reasonable determination.  Nor, for that matter, does Raytheon cite any facts in the record even suggesting that the Court ought to credit VK's later statement.  As explained *supra*, the law points in the other direction, giving the CO the benefit of the doubt.  Absent clear evidence that the call on the field must be overturned — *i.e.*, showing that the CO or the declarations on which the CO relied were *mistaken* and not merely disputed — it must be upheld.

### 3.     Raytheon failed to meet its burden to demonstrate that the CO's analysis is unreasonable.

Raytheon also challenges the CO's characterization, *i.e.*, his analysis, of the undisputed facts.  If Raytheon could show that the CO misunderstood the significance of VK's activities, and that viewing the facts in their proper context would reveal that VK had only *de minimis* participation on DBD matters, this Court could conclude that, even accepting all the *facts* in the CO's D&F, it was unreasonable to exclude Raytheon for an appearance of impropriety.  Raytheon thus argues, for example, that "VK did not *personally* or *substantially* participate on either the DET or EMD contracts . . . and did not have any *meaningful* role in the development of Raytheon's EMD proposal . . . ."  Pl. MJAR at 2 (emphasis added).  Of course, the issue here is only whether the CO reasonably determined that an appearance of impropriety justified excluding Raytheon from the procurement.  Nevertheless, the Court agrees that Raytheon could prevail if it were to show that a reasonable third-party observer analyzing the facts of this case would conclude, contrary to the CO, that the facts amount to no more than a hill of beans.  *R & W Flammann GmbH*, 339 F.3d at 1324 (explaining that there is no appearance of impropriety where a "disinterested observer knowing all the facts and the applicable law would see nothing improper").  But Raytheon fails to do so.

As detailed *supra*, the CO reasonably found more than VK's *de minimis* involvement with DBD both when he was a Navy and then a Raytheon employee.  The CO drew on specific evidence regarding access to information and contributions to technical discussions to support his conclusion that VK had not insubstantial inside knowledge of, and influence on, the DBD DET contract while with the Navy.  AR 48046.  The CO characterized VK's helping to "define techniques for a towed decoy" and provide

"inputs on the DBD DET Statement of Objectives as well as the scope of testing to be conducted in support thereof" as providing VK "with unique insight regarding the Government's future DBD requirements." AR 48068. The fact that VK helped define what the government would be looking for in its DBD effort is reasonably characterized as substantial, important, more-than-minimal involvement, which, combined with the fact of VK's subsequent employment with a potential offeror on the same procurement, a third-party observer would consider fishy.

The events of the period between VK's outreach to Raytheon and his eventual departure from the Navy badly undermines Raytheon's case. The CO's conclusions regarding VK's appearance of a conflict — what in other legal contexts might be called a breach of the duty of loyalty — are hard to argue with. VK did not recuse himself from DBD work, did not provide written notice to his supervisors, and clearly violated his NDA during this period. Tr. 40:13-41:1 (Counsel for Raytheon agreeing that this Court would not "be wrong to find that [VK] violated the NDA . . . [b]ased on the record"). More importantly, the NDA specifically restricted him from pursuing employment with a number of companies, including Raytheon. AR 48270-72. Furthermore, the CO identified certain work, summed up as "recommendations and advice" or "technical input" on DBD requirements, that VK performed on DET while he sought employment with Raytheon. AR 48047, 48050. Having reviewed the complete administrative record, including the classified portion — which provides more details on the nature of this advice — the Court is satisfied that the CO was within the bounds of reasonableness in determining that VK's work in this period was substantial enough to create an appearance of impropriety.

VK's lack of candor throughout the time period scrutinized by the CO may be a product of ignorance, but coupled with his surreptitious negotiation of employment with Raytheon in violation of his NDA could well amount to criminal conduct, as the CO noted. AR 48047 (discussing "apparent violations of DoD regulations"). After accepting Raytheon's offer, moreover, VK — while still working for the Navy and without providing any official notice of his impending departure — "actively participated in secure email chains discussing DBD EMD requirements and how to address those requirements at an upcoming [NARG] event." AR 48049. He sent classified emails "regarding tow length for DBD and proposing that the Government hold a detailed discussion regarding tactics, trade-offs, and decoy areas of concern" and "provid[ing] his 'initial analysis' related to one of the DBD NARG topics." *Id.*

Merely deeming "reasonable" the CO's conclusion that this created an appearance of impropriety is an understatement. If nothing else, VK's likely NDA violation is decisive. VK knew or ought to have known that his interactions with Raytheon's representative were prohibited by the NDA (which covered not merely DET but all of DBD), went ahead and pursued and accepted a job with Raytheon regardless, and then failed to make the Navy aware of what he was up to. His evasiveness — followed by a

sudden about-face on his second day with Raytheon — would lead any objective, third-party observer to notice that "[s]omething is rotten" (not in Denmark, of course, but rather with VK's side-switching).[34]

VK's failure to "include all relevant information reasonably available to the official or former official," FAR 3.104-6(b), on his ethics opinion request[35] not only prevents him and Raytheon from relying on the ethics opinion for washing their hands of this appearance of impropriety — it adds to the funny smell.  VK was required to "include information about the . . . [p]rocurement(s) . . . involving the particular contractor, in which the individual *was or is* involved, including contract or solicitation numbers, dates of solicitation or award, a description of the supplies or services procured or to be procured, and contract amount[.]" FAR 3.104-6(b)(1) (emphasis added). Yet when leaving the Navy — and still actively discussing DBD matters — VK omitted all that information. The CO rightly pointed out that if it occurred to VK to raise the issue of a potential appearance of impropriety several months later, almost immediately after starting work at Raytheon, he could have and should have been careful to raise it *before* leaving the Navy.  *See* AR 48034-35 (CO commenting that "[i]t is notable that VK did not advise the Government's ethics counselor" of VK's prior participation in the DBD program "while he was still employed with the Government and seeking post-Government employment advice").

Similarly, the CO's analysis of VK's activities after joining Raytheon warrants deference. The critical question is whether Raytheon took any steps to mitigate VK's actual or potential conflict of interest or to firewall him from the procurement to protect against the sharing of any proprietary or procurement-sensitive information.  The answer is no.  That is not entirely Raytheon's fault, given that VK did not raise the DBD issue until he already was employed at Raytheon.  Whether Raytheon's compliance machinery should have caught the issue or someone there should have asked harder questions is not for this Court to decide.  The only question for this Court is whether the CO's conclusion about VK's role at Raytheon was reasonable.  And, indeed, Raytheon does not contest that VK worked on EMD while in its employ.  Indeed, VK

> authored work products (e.g., CDRL deliverables and briefs), authored and owned Raytheon's proposed changes to the DBD Goals Document, provided contributions to the RFI that resulted in changes to the Government's documents, and represented Raytheon at a number of recurring and nonrecurring events with the Government, such as DBD bi-

---

[34] WILLIAM SHAKESPEARE, HAMLET, ACT I, SC. 4.

[35] *See* Tr. 63:9-12 (Counsel for Raytheon agreeing that VK "never disclosed his DBD involvement the government" ethics official and that VK's ethics "letter doesn't cover this").

> weekly status meetings, test events, Program Management
> Reviews (PMRs), Technical Interchange Meetings (TIMs), and
> DBD milestone events.

AR 48058.

Given these facts, the CO concluded that VK's role at Raytheon "consisted of far more than mere 'behind-the-scenes' assistance, constituting an apparent violation of the statute and regulation" and "present, at minimum, an appearance of impropriety." AR 48058. The Court is hard-pressed to disagree; even Raytheon stakes its argument on showing that this work has no connection to the work VK did while at the Navy, either because his EMD work is unrelated to DET, or because his DET work was negligible. The Court finds the CO's rejection of both of those characterizations rooted in specific factual findings and eminently reasonable.

Ultimately, Raytheon cannot purify or otherwise mask the "certain aroma," *NKF*, 805 F.2d at 377, which the CO sensed emerging from the structural conflicts, inconsistencies, and signs of evasiveness that pervade VK's move from the Navy to Raytheon. The Court does not necessarily consider every characterization and every bit of the CO's analysis bulletproof, but the standard of review does not require more than what the Navy provided here. The CO's determination is more than reasonable. *See A Squared Joint Venture v. United States*, 136 Fed. Cl. 321, 330 (2018) (holding, in reliance on *NKF*, that "deference is owed to a CO's decision to disqualify a contractor based on the appearance of [an] OCI" and finding that "program managers['] . . . access [to] sensitive information coupled with the fact that information relevant to a[ ] competitor was present in files . . . created [a] significant potential OCI" and "amount[ed] to more than mere 'suspicion or innuendo'" (quoting *Turner*, 645 F.3d at 1387)).

### C.  The Remaining Counts Are Without Merit

Because Raytheon conceded that its remaining counts in its complaint depend solely upon Raytheon's primary challenge to the CO's determination that an appearance of impropriety justified the CO's excluding Raytheon from the procurement, Tr. 122:16-17, 123:9-14, the government is entitled to judgment upon those counts as well.

### V.    CONCLUSION

Whether *NKF* was correctly decided, or whether the Navy's exclusion of Raytheon here will have deleterious effects on the employment market for former government employees, is a problem for Congress, the FAR Council, and the Federal Circuit — and not this Court — to resolve. In the meantime, government contractor compliance personnel should take care to drive home the lesson of this line of cases: best to err on the

side of diligence and caution when managing the revolving door between the public and private sectors.

Given that Raytheon failed to meet its burden to demonstrate that the Navy's decision to exclude Raytheon was arbitrary, capricious, or otherwise contrary to law, this Court **DENIES** Raytheon's MJAR and **GRANTS** the government's and BAE's MJARs. The clerk is directed to enter **JUDGMENT** for Defendant, the United States, and Defendant-Intervenor, BAE Systems.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge